*John Basciano v. William R. Foster, et ux.*
No. 1978, Sept. Term 2021
Opinion by Leahy, J.

**Family Law > Child Custody >** *De Facto* **Parenthood > Absence of Consent to Formation and Establishment of Parent-Like Relationship with Child**

Applying the principles and teachings imparted in *Conover v. Conover*, 450 Md. 51 (2016), and *E.N. v. T.R.*, 474 Md. 346 (2021), we hold that where a child's existing legal parents both do not consent to the formation of a parent-like relationship between the child and a third party, the third party has failed, under the first factor of the *H.S.H.-K.* test adopted in *Conover*, to establish a *de facto* parent relationship. *See E.N. v. T.R.,* 474 Md. at 401 ("Read to its logical conclusion, to satisfy the first factor, where there are two legal parents, both parents must knowingly participate in consenting to and fostering the third party's formation of a parent-like relationship with a child.").

**Family Law > Child Custody >** *De Facto* **Parenthood > Absence of Consent to Formation and Establishment of Parent-Like Relationship with Child > Unfitness or Exceptional Circumstances**

The first factor of the *H.S.H.-K.* test requires that "the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child." *Conover v. Conover*, 450 Md. 51, 74 (2016) (quoting *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wis. 1995)). The third party, however, may obtain custody of the child after establishing that the parents are either unfit or that exceptional circumstances exist such that continued custody with the parents would be detrimental to the child's best interest. *E.N. v. T.R.*, 474 Md. 346, 372 (2021) (describing requirement for third-party standing in a custody case); *Ross v. Hoffman*, 280 Md. 172, 178-79 (1977) (holding that the presumption of custody with a parent may be overcome if "(a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child"). Once a party has demonstrated unfitness or exceptional circumstances, the court can proceed to the best interests of the child analysis, and there is no need to show de facto parentage in order for the third party to have standing.

Circuit Court for Anne Arundel County
Case No. C-02-FM-20-001874

CHILD ACCESS

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1978

September Term, 2021

_____

JOHN BASCIANO

v.

WILLIAM R. FOSTER, ET UX.

_____

Kehoe,
Leahy,
Friedman,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: November 1, 2022

*Ripken, Laura S., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In *Conover v. Conover*, the Court of Appeals first recognized *de facto* parenthood as "a viable means to establish standing to contest custody or visitation." 450 Md. 51, 59 (2016). Judge Adkins, writing for the Court, profoundly acknowledged that "[c]hild custody and visitation decisions are among the most serious and complex decisions a court must make, with grave implications for all parties." *Id.* at 54.

Appellant John Basciano ("Father") appeals from an order of the Circuit Court for Anne Arundel County establishing the appellees, Colleen Foster and William R. Foster (collectively, the "Fosters"), as *de facto* parents. The Fosters are the maternal grandparents of the only child between Father and their daughter, Katie Lynn Foster ("Mother").[1] The court granted Father and the Fosters joint legal custody of the minor child with tie-breaking authority to the Fosters, and primary physical custody to the Fosters. In the first of three issues raised in this appeal, we review whether the circuit court abused its discretion in finding that, despite the absence of consent by either of the child's parents, "exceptional circumstances" warranted granting the child's maternal grandparents *de facto* parenthood status under the test enunciated by the Court of Appeals in *Conover*.

Applying the holdings and the principles imparted in *Conover* and the Court's more recent opinion in *E.N. v. T.R.*, 474 Md. 346 (2021), we hold that where a child's existing legal parents both do not consent to the formation of a parent-like relationship between the child and a third party, the third party has failed to establish a *de facto* parent relationship.

---

[1] Mother last participated in the proceedings in the circuit court at the scheduling conference in February 2021. Her whereabouts were unknown at the time of the trial, and she is not a party to this appeal.

Because neither Father nor Mother consented to the development of a parent-like relationship, *de facto* parenthood cannot be conferred on the Fosters under the first factor of the *H.S.H.-K.*[2] test adopted in *Conover*. *See E.N.*, 474 Md. at 401 ("Read to its logical conclusion, to satisfy the first factor, where there are two legal parents, both parents must knowingly participate in consenting to and fostering the third party's formation of a parent-like relationship with a child."). We further conclude, however, that based on the circumstances in this case, the circuit court did not abuse its discretion in finding exceptional circumstances sufficient to award the Fosters third-party custody of their grandchild.[3]

## BACKGROUND

Father and Mother, who never were married to each other, are the biological parents of their only child, C., who was born in January 2020.

On or about July 22, 2020, the Fosters were contacted by the Maryland Department of Human Services and were informed that Mother and Father had overdosed on heroin while caring for C., who was just six months old. Drugs and drug paraphernalia were found in several areas of the apartment.

C. was placed in the care of the Fosters, and the Anne Arundel Department of Social Services executed a safety plan. The Safety Plan reflected that C. "will remain in the care of maternal grandparents . . . due to parental drug use." It instructed that any visitation

---

[2] *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wis. 1995).

[3] To protect the identity of the child, we refer to him as "C." throughout this opinion.

2

from Mother and Father "be supervised at all times" by the Fosters. The Safety Plan was signed by both the assessor and Mr. Foster. While Father was present when the Safety Plan was discussed, the Plan does not bear his signature. Both Mother and Father were arrested and charged with drug offenses and child endangerment.

**Emergency Complaint for Custody**

The Fosters filed a complaint for custody and motion for emergency and *ex parte* relief on July 27, 2020, and Mr. Foster appeared for an emergency hearing before a magistrate that same day.

At the hearing, Mr. Foster testified that, on the night of July 22, 2020, he was contacted by someone at the Maryland Department of Human Services, who informed him that his daughter had overdosed on heroin. Father also overdosed the prior night in the same apartment. Mr. Foster rushed to the apartment to pick up C. so that he would not be placed in foster care.

Mr. Foster explained that, after Mother had been sober for 11 months, the Fosters got Mother an apartment "on her own just a couple of days before this incident" and were unaware that Father "was in the area or in the apartment." Mr. Foster opined that Father is "a present danger to both my daughter and the baby. And every time he shows up, we have these kind of problems. So we had no idea that [Father] was involved until the police called us."

The magistrate found that extraordinary circumstances existed and recommended granting temporary custody of C. to the Fosters on July 27, 2020. Specifically, the magistrate found:

3

The Plaintiffs (maternal grandparents) were given physical custody of the infant minor child when the Defendant (mother) overdosed on heroin and was taken to the hospital on Thursday night. The mother's current drug abuse makes her incapable of caring for the child. The Defendant (father) overdosed on Wednesday night, after checking himself out of a drug treatment program. It is believed that the father supplied the mother with her drugs.

A circuit court judge entered an order ratifying the magistrate's findings and recommendations that same day. The court's order also directed the Fosters to serve the complaint for custody and summons on Mother and Father.

Father and Mother were served with process on August 14 and 20, respectively. Father then filed an answer to the complaint on October 2, 2020. He alleged that he did not supply drugs to Mother and was "getting help for [his] addiction" by completing a "30-day rehab" and participating in an outpatient program. Mother answered the complaint on January 6, 2021.

After Father's counsel entered an appearance, Father filed an amended answer. Among other things, he alleged that, "after the overdose incident on July 23, 2020, [Father] immediately sought the proper help and treatment necessary to live a sober life in order to be the best parent he can be for the minor child. [Father] has continued in his treatment and will likewise continue such treatments and therapies for the foreseeable future." Father requested that the court award him "sole physical and legal custody of the minor child" or, in the alternative, "determine a graduated access plan between the [Fosters], [Father], and the minor child where the end result awards primary physical custody to [Father]."

4

**Parenting Plan**

On May 25, 2021, the Fosters and Father "reached a temporary agreement regarding access" with C., titled "Parenting Plan – Overnight Visitation Stipulation." At the time, Father was living with his parents. The Parenting Plan, signed by Father and his parents and approved by the Fosters, required Father, among other things, to maintain "active membership in a state certified drug recovery program" and provide documentation of this status to the Fosters every 30 days. The Plan required Father to submit to a hair follicle drug test and undergo a urinalysis every seven days and provide those results to the Fosters. The Plan further required Father to "continue with psychotherapy and/or medication management [], follow recommended treatment, and comply with prescription medication requirements." Every 21 days, Father was obligated to provide a letter from his psychotherapist or "medication management doctor" stating whether he is following recommended treatment and "is a present risk to harm himself or third persons."

Father's parents, the Bascianos, agreed to report Father's "behavior honestly and accurately prior to and during overnight visitation" and to "request that [Father] immediately vaca[te] their residence if drug intoxication and/or mental health episodes are witnessed or even suspected." They also agreed to supervise C., and that "at no time shall [Father] or any third party be left alone unsupervised" with C.

The court ratified the parties' agreement into a *pendente lite* order regarding visitation on the same day.

On May 26, 2021, the court ordered a custody evaluation. As explained below, the court-appointed custody evaluator appeared at the custody hearing and presented her findings and recommendations. Her report was admitted into evidence.

**Merits Trial**

The case proceeded to a one-day trial on December 15, 2021.

*The Fosters' Case-in-Chief*

Following opening arguments, counsel for the Fosters called Heather Szymanski, a special educator with the Anne Arundel County Public Schools. Ms. Szymanski was assigned to work with C. twice a month through the Infants and Toddlers Program and focused on "building basic play skills and social interaction and communication." She explained that she had "definite concerns of autism and his social interaction" and that "communication would be the biggest concern[] right now." Ms. Szymanski recommended that C. move to a "more intensive program" focused on autism. Because the program was weekly, C. would not be able to attend the program during weeks that he was with Father and his parents in New Jersey.

Ms. Szymanski then testified that C. was "showing a five[-]month development" in communication at his initial testing when he was actually 16-months old. According to Ms. Szymanski, it was "extremely important for [C.] to receive services and to get the type of services that he needs" because, to a child who may have autism, such services make "a huge difference for what the outcome looks like . . . when they start kindergarten." On cross-examination, Ms. Szymanski did not have enough knowledge of New Jersey's

programs to opine whether they were similar to Maryland's but agreed that the coaching model employed at the County was "widely accepted."

Next, Father called his primary care physician, Andrew Johnston.[4] Dr. Johnston testified that he had treated Father since February 2020. Dr. Johnston explained that Father had been drug tested every month since August of 2021 and that he had not seen any positive results for marijuana, opioids, fentanyl, heroin, meth or PCP. On cross-examination, Dr. Johnston confirmed that he was not aware of the number of overdoses that Father had since he learned that Mother was pregnant with C. or if Father had abused his prescribed medication.

After Dr. Johnston's testimony concluded, the Fosters resumed their case-in-chief and called Anita Tucker, the custody evaluator. After testifying that she did not have concerns about the Fosters' fitness to care for C., Ms. Tucker summarized the recommendations from her report:

> I recommended that Mr. and Mrs. Foster continue to have primary physical custody and that [Father] have a graduated schedule with more time with [C.], which I believe should start sometime after [C.] was due to have an updated treatment plan from Infants and Toddlers. So based on his - - [C.]'s progress with his therapy and doing therapy with the Fosters and with the Bascianos whenever they had him. . . . And then also contingent on [Father]'s participating in - - that he participate in [C.]'s therapy sessions and that he continue[] his participation in the 12 Step program, his medication assisted therapy, his individual therapy, and then either monthly urinalysis or a hair follicle test every 90 days.

---

[4] The court allowed Father to call this witness during the Fosters' case-in-chief because he was testifying virtually on Zoom.

7

Ms. Tucker explained that she recommended the Fosters have final decision-making authority, in part, because C. "was staying with the Fosters more of the time and his pediatrician, the Infants and Toddlers people were all down here." Ms. Tucker further recommended that primary physical custody should remain with the Fosters because "that was the status quo and [she] thought they should stick with the status quo at least until [C.] moved on further in his therapy and they were able to give some indication about is this working." Ms. Tucker could not opine whether the Bascianos would report if Father relapsed. Finally, Ms. Tucker testified that C. is "primarily" attached to Ms. Foster.

On cross-examination, when asked whether her concerns about Father having custody of C. would be ameliorated if Father remained sober, Ms. Tucker replied:

> [Y]es, they would be lessened about him having either a shared 50/50 custody schedule or them moving toward him having primary physical custody. . . . But at the time I wrote the report I felt the Fosters should still have the primary physical custody but the intention was not that they retain it forever, . . . certainly over time he could be the primary custodian with the Fosters still obviously involved, because I believe that they are very much attached to him and [C.] is very much attached to them and I don't believe that they should just be eliminated from his life.

On re-direct examination, Ms. Tucker opined, even if Father "was still on track," that "there still need[ed] to be a gradual transition." Ms. Tucker further testified that if C. is "going to live with [Father], that [Father] should be living with his parents."

Christopher Foster testified next.[5] He is the son of the Fosters and Mother's older brother. Christopher related that Ms. Foster cared for his children for a couple of years,

---

[5] Because Mr. Christopher Foster shares a last name with Mother and the Fosters, we refer to him by his first name in order to avoid confusion. In doing so, we mean no disrespect.

8

and that both Mr. and Ms. Foster were fit to care for C. He was not in contact with Mother and did not know anyone in the family who knew her whereabouts. According to Christopher, Mother was at his house a "lot when she was pregnant," and he saw her "for a brief time" after she gave birth to C.

Christopher opined that, based on his personal knowledge, neither Father nor Mother were fit to be the sole custodial provider for C. In particular, Christopher was not sure that Father was "over" his addiction. He further explained that he was worried about domestic abuse between Father and Mother and witnessed bruises on Mother but was not aware of any incidents when Mother actually accused Mr. Foster of physical violence.

Ms. Foster then took the stand, and, among other things, explained that ever since the parties began alternating weeks with C., C. had difficulty returning to his sleep schedule upon his return. Ms. Foster also noticed that C. had bitten his nails "halfway down his little fingers" due to separation anxiety. She said that a consistent sleep schedule was "extremely important" for a child with C.'s developmental delays because he could not "ask for his needs" but "need[ed] someone who knows his cares." When this consistency was lacking, Ms. Foster testified, C. was "suffering."

Ms. Foster further explained that, while she had no problem communicating with Father, all of her communications regarding C. were with Ms. Basciano. In short, she summarized that she had not been co-parenting with Father but with his mother. Although Ms. Foster was "very proud of how far [Father] ha[d] c[o]me since July 20th," she "would like to see at least another year where everything stays the same and progress keeps going forward, in order that [her] grandson is never exposed to that kind of horrific ordeal again."

Concerning Mother and Father's relationship, Ms. Foster confirmed that she received calls relating to "very erratic behavior" and reports of physical violence but had not "witnessed the actual abuse itself."

Finally, Mr. Foster testified, and began by expressing his concern that Father had had additional overdoses after the July 2020 incident. Specifically, Mr. Foster referenced that both Mother and Father were "on the streets of Camden for a couple of weeks" in August 2020. Mr. Foster further testified to concerns regarding Father's medications and compliance with the Parenting Plan.

Mr. Foster testified that on July 23, 2020, he signed the Safety Plan and that the representative from Child Protective Services "had both [Mother and Father] sign it." Mr. Foster concluded his direct testimony by seeking a "return to [visitation for Father] every other weekend" because "it seemed to work better for [C.]"

*Father's Case-in-Chief*

Father called his employer, Tadita Covington, manager at Planet Fitness. She related that Father had worked for her at Planet Fitness since January 2021—approximately 11 months—and she described him as an "outstanding employee." She explained his dedication to study and pass the test for his trainer certificate, as well as his desire to become a manger. She said she was "so proud of him" because he had come "a long way," and noted that Father was "an amazing asset honestly to our club." She claimed that he brought "positivity," and that he was "always happy." Ms. Covington described Father as "reliable" and a great coach.

Ms. Basciano, Father's mother, testified next that C. and Father "have a lot of fun" and that Father also cared for C., gave him baths, fed him, and changed his diaper. She described their routine with C. and noted that she and Ms. Foster were "in constant contact" and cooperated very well with each other about what worked best. According to Ms. Basciano, Father participated in pick up and drop off as long as his work schedule allowed it. She related that, during one seven-day period while the Bascianos and Father were on vacation with C., Father "did everything." She opined that Father "wants to be there for [C.] and be responsible" and "just loves it." Ms. Basciano testified that Father was determined to remain sober and wanted to be "the dad that he's supposed to be."

Finally, Father testified. He began by clarifying that he was in "recovery" but not fully "recovered." He established a "routine throughout [his] recovery," which included a "12 step meeting," "church every Sunday," therapy, and "simply spending time with [his] family." He explained that in the past when he tried to get sober, he "never had a motivation to stay sober" and felt that he "was a failure" and would "never do anything with [his] life." Father claimed that he and C. had "built a very, very strong bond" and that C. "knows that I'm dad." He admitted that he had concerns about C.'s speech delay and potential autism. Father did not have concerns about the Fosters' care for C., but expressed that he felt "as though they have attacked me as the father" and that "nothing will ever be good enough to them." He requested that C. live with him and that he raise his son.

At the conclusion of Father's testimony, the court heard closing arguments and took the matter under advisement.

11

**Ruling**

The parties reconvened before the circuit court on January 18, 2022 to receive the court's ruling. After accepting Mr. Foster's proffer regarding his annual income, the court delivered a lengthy ruling from the bench. At the outset, the court recognized the "fundamental right" of parents to "direct and govern the care, custody, and control of their children." The circuit court then noted that *de facto* parenthood does not contravene these principles and proceeded to analyze each of the factors from the four-part test first adopted in *Conover v. Conover*, 450 Md. 51, 85 (2016):

> The first [factor], the legal parent must consent to and foster the relationship between the third party and the child. [C.] was placed in the Foster's care by Child Protective Services in July of 2020 after [Father] and [Mother] overdosed on heroin with [C.] in their care. Immediately following the incident, the Fosters sought and were awarded emergency custody of [C.]. The Court of Appeals had held that both legal parents must consent to a third party *de facto* parent relationship unless non-consenting parent is unfit or exceptional circumstances exist.
>
> Here, [Mother] has been battling drug addiction, her current whereabouts are unknown and living conditions are unknown, and she has not been involved in [C.]'s life since he was, approximately, six months old. The Court finds that she is not a fit parent to care for [C.] at this time.
>
> [Father] argues that the Fosters cannot meet their burden to establish the first prong, consent, because [C.] was placed in their care by DSS, and they received custody after seeking court intervention. This Court disagrees. I find that the Fosters are able to prove this prong because exceptional circumstances exist.
>
> At the time that [C.] was placed in the Foster[s'] care, [Father] overdosed on heroin while [C.] was in his and the [Mother]'s care. [C.] was just six months old at the time that the Fosters assumed daily parenting responsibilities.
>
> [Father] began receiving substance abuse treatment in the later part of 2020, and was not able to provide a stable environment for the baby. [Father] relinquished all parenting responsibility to the Fosters until May of 2021 while he focused on his recovery and demonstrated very little parenting responsibility for [C.] during that time. [Father] has been sober since August 9th, 2020.

12

While this [c]ourt applauds [Father]'s efforts and successes that he has made while he was in treatment and continues to make, this [c]ourt also recognizes that this period of time allowed the Fosters to bond with [C.] as parents.

The Fosters are primarily responsible for all aspects of [C.]'s daily care and long-term care. Even [Father], through his conduct, recognizes this dynamic. [Father] refers to the Foster[s]' decision-making regarding decisions that impact [C.]'s welfare.

One example of many is that he became aware that the Fosters had made arrangements to address [C.]'s developmental delays . . . with a pediatrician and Anne Arundel County Infant and Toddlers. Even though the program is for parents, he deferred . . . to their decision-making regarding [C.]'s involvement in the program.

The Court finds that [*de facto*] parenthood of [C.] was established by the Fosters through exceptional circumstances, therefore they were able to meet the first prong. Having found that the first prong has been met, I will make my findings regarding the remaining prongs, although I will note that they were largely uncontested.

The second prong is that the third party must have lived with the child. Here[,] the Fosters and [C.] have lived together in the same household since July 2020.

Three, the third party must perform parental functions for the child to a significant degree. The Fosters have taken on real parenting responsibilities and taken them over since July 2020, including being primarily responsible for [C.]'s care, education, development, and contribute towards his financial support without any expectation of any financial contribution.

The role encompasses all aspects of parenthood, including researching, enrolling, and participating in Anne Arundel County's Infant and Toddlers Program/Parent Child Learning Series with [C.].

The fourth prong is that a parent/child bond must be forged. This [c]ourt finds that the evidence indicates that the Fosters and [C.] have formed a parent/child bond relationship. [C.] has relied on the Fosters as his primary caretakers for most of his young life. After review of the facts, I've concluded that the Fosters have met their burden of proving that they are de facto parents.

Having concluded that the Fosters are *de facto* parents of C., the court then turned to analyze the custody factors set forth in *Montgomery County Department of Social Services v. Sanders*, 38 Md. App. 406, 420 (1977) and *Taylor v. Taylor*, 306 Md. 290, 304-11 (1986). The court found, among other things, that the Fosters are "fit parents" and "have

13

provided a stable and loving home for [C.]." While there were "reasonable grounds" to believe that C. "has been neglected by [Father]," the court found that the "neglect is not likely to occur again." The court noted that Father has "completely turned his life around . . . taking more parental responsibility and . . . taking active steps to receive treatment." While the court did "have some concerns that he has yet to demonstrate an ability to care for [C.] without the assistance of his parents, those concerns do not amount to him being unfit."

Regarding the "age, health, and sex of the child," the court found that C. "has significant communication and social developmental delays" and was receiving services for developmental delays through Anne Arundel County, for which he was eligible only if he resided in the County at least half the time. The court specifically found that it was in C.'s "best interest to receive early intervention services that specialize in developmental delays." The court had concerns with Father's "ability to maintain a stable home for [C.], because he is heavily reliant on the family and is at the beginning stages of being self-sufficient." The court referenced "concerns" that Father "has had minimal involvement in pediatrician appointments" and "treatment strategies" and concluded that it had "significant concerns that extended time . . . without [support] services would have a detrimental impact on [C.]'s wellbeing."

Concerning the willingness of the parents to share custody, the court noted that the parties agreed that C. should eventually be in Father's care, but the Fosters believed it was too early in Father's recovery to assume the role of primary caretaker. Given C.'s "needs for his suspected autism and a need for consistent services," the court found that the week

14

on/week off schedule was "not in his best interest on a long-term basis." Although C. and the Fosters had a "parent/child relationship," the court observed that Father is "at the beginning stages of having a parent/child relationship."

The court concluded: "After consideration of all the factors, the [c]ourt has determined that it is in the best interest of [C.] to grant primary physical custody to the Fosters and to have joint legal custody [between Father and the Fosters] . . . with the Fosters having final decision-making authority." The court then outlined an access schedule, under which Father had visitation every third week of the month, although Father's visitation with C. was to be supervised until he provided a negative hair follicle test "at his expense." After complying with this directive, Father would have "increased access for the holidays." Mother was granted supervised access at the Fosters' discretion.

Finally, the court awarded child support to the Fosters in the amount of $338 per month. The judge memorialized her ruling in a written order that was entered on February 10, 2022. Father noted a timely appeal and presents three questions for our review:

1. "Did the trial court err when it conflated the test for a *de facto* parent relationship with 'exceptional circumstances'?"

2. "Did the trial court err and/or abuse its discretion when it found that 'exceptional circumstances' existed which were sufficient to confer parental status on the maternal grandparents?"

3. "Did the trial court abuse its discretion when it entered an order under which [Father] cannot increase his time with the child, absent consent or a change in circumstances?"

15

**STANDARD OF REVIEW**

As directed by Maryland Rule 8-131(c), when an action has been tried without a jury, we apply the clearly erroneous standard of review to the trial court's factual findings and review the court's decision for legal error. Maryland decisional law adjusts and fine tunes this general standard to accommodate our review of the diverse cases that come before our appellate courts. In child custody disputes, for example, the best interests of the child "guides the trial court in its determination, and in our review" and "is always determinative." *Santo v. Santo*, 448 Md. 620, 626 (2016) (quoting *Ross v. Hoffman*, 280 Md. 172, 178 (1977)). The Court of Appeals articulated the standard of review an appellate court should apply in reviewing a custody determination in *Santo v. Santo*:

> We review a trial court's custody determination for abuse of discretion. This standard of review accounts for the trial court's unique opportunity to observe the demeanor and the credibility of the parties and the witnesses.
> Though a deferential standard, abuse of discretion may arise when no reasonable person would take the view adopted by the trial court or when the court acts without reference to any guiding rules or principles. Such an abuse may also occur when the court's ruling is clearly against the logic and effect of facts and inferences before the court or when the ruling is violative of fact and logic. Put simply, we will not reverse the trial court unless its decision is well removed from any center mark imagined by the reviewing court.

*Santo*, 448 Md. at 625-26 (cleaned up). On review, we grant the trial court broad discretion "because only [the trial court] sees the witnesses and the parties, hears the testimony and has the opportunity to speak with the child." *Burak v. Burak*, 455 Md. 564, 617 (2017) (quoting *In re Yve S.*, 373 Md. 551, 585-86 (2003)). Comparatively speaking, a trial court "is in a far better position . . . to weigh the evidence" and determine custody, than an appellate court with only a "cold record before it." *Id.*

16

Even under this deferential review, however, a court's discretion is always tempered by the requirement that the court apply the correct legal standards. *Faulkner v. State*, 468 Md. 418, 460-61 (2020) (citing *Jackson v. Sollie*, 449 Md. 165, 196 (2016)); *In re Dory*, 244 Md. App. 177, 203 (2019) ("[T]rial courts do not have discretion to apply incorrect legal standards and a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion." (cleaned up)).

## DISCUSSION

## I.

### *De Facto* Parentage

### A.     Parties' Contentions

Father avers that the "trial court erred when it conflated the test for *de facto* parent[age] with 'exceptional circumstances.'" According to Father, there are only three situations in which a third party may acquire the same status as a natural parent: (1) where the natural parents are unfit, (2) where "exceptional circumstances" exist, or (3) where *de facto* parentage has arisen. Relying on *Conover v. Conover,* 450 Md. 51 (2016) and *B.O. v. S.O.*, 252 Md. App. 486 (2021), Father argues that the three situations in which a third party may contest custody or visitation are distinct and disjunctive—which means that "'exceptional circumstances' cannot be swapped for parental consent." In other words, the "exceptional circumstances" analysis is separate and apart from the four factors that courts must consider in deciding whether *de facto* parenthood has been established. Father asserts that the court in this case erred when "it substituted a finding of 'exceptional

17

circumstances' for the consent requirement which is a prerequisite to a finding of *de facto* parentage."

In refuting Father's claim, the Fosters call attention to the recent decision by the Court of Appeals in *E.N. v. T.R.*, 474 Md. 346 (2021), which, they contend, clarifies that the first prong of the test to determine whether *de facto* parentage has been established may be met by a showing of "exceptional circumstances." In the alternative, the Fosters contend that "implicit consent can clearly be extrapolated from Father's conduct" because of his heroin use while the "Fosters were the primary caregivers for [C.]." We begin our analysis with a broad outline of the fundamental rights at stake in a child custody case.

## B. The Fundamental Right of Parents and the Child's Best Interests

The Supreme Court of the United States has recognized that the Due Process Clause of the Fourteenth Amendment necessarily "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *see also Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (holding that parents have a "cognizable and substantial . . . interest in retaining custody of [their] children"); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (concluding that, under the Due Process Clause, a parent's liberty interest includes the rights of parents to "establish a home and bring up children" as well as to control their education). Indeed, the Supreme Court has classified the liberty "interest of parents in the care, custody, and control of their children[]" as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65.

18

Maryland courts, in turn, have "consistently echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one that cannot be taken away unless clearly justified." *In re Yve S.*, 373 Md. 551, 566 (2003) (citations omitted). Our Courts have deemed the right to rear one's children as "essential" and have included this right among a parent's "basic civil rights." *Wagner v. Wagner*, 109 Md. App. 1, 37 (1996) (citations omitted); *see also* Maryland Code (1984, 2019 Repl. Vol.), Family Law Article, § 5-203 ("parents are the joint natural guardians of their minor child").

Balanced against parents' liberty interest are children's "indefeasible right to have their best interests fully considered" in child custody cases. *A.A. v. Ab.D.*, 246 Md. App. 418, 422 (citing *Flynn v. May*, 157 Md. App. 389, 410 (2004)), *cert. denied*, 471 Md. 75 (2020). We have repeatedly emphasized that in cases where the child's best interest standard applies, "it is the central consideration." *Id.* at 441 (quoting *McDermott v. Dougherty*, 385 Md. 320, 354 (2005)). While the best interest of the child standard is of "transcendent importance," this standard "does not ignore the interests of the parents and their importance to the child" as "in almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent." *McDermott*, 385 Md. at 354 (quoting *Boswell v. Boswell*, 352 Md. 204, 220 (1998)).

In a custody dispute between two fit parents, a court may focus solely on the child's best interests and avoid this delicate constitutional balancing because "each fit parent's constitutional right neutralizes the other parent's constitutional right," rendering the parents as "presumptive equals." *Id.* at 353. Correspondingly, as the Court of Appeals

19

recognized in *Conover*, "the rights of parents to custody of their children are generally superior to those of anyone else[.]" 450 Md. at 60. Indeed, the Court of Appeals recently reemphasized:

> Where the dispute is between a fit parent and a private third party, both parties do not begin on equal footing in respect to rights to "care, custody, and control" of the children. The parent is asserting a fundamental constitutional right. The third party is not. A private third party has no fundamental constitutional right to raise the children of others.

*E.N. v. T.R.*, 474 Md. 346, 371 (2021) (quoting *McDermott*, 385 Md. at 353).

Historically, in light of the custody interests involved, a third party seeking custody or visitation must, at the threshold, show unfitness of the natural parents or that extraordinary circumstances exist before a trial court may consider whether that third party should be awarded custody under the best interests of the child standard. *Conover*, 450 Md. at 61. Our Court of Appeals has "explained that, in custody cases, 'unfitness means an unfitness to have custody of the child, not an unfitness to remain the child's parents; exceptional circumstances are those that would make parental custody detrimental to the best interest of the child.'" *E.N.*, 474 Md. at 372 (quoting *In re Adoption/Guardianship of H.W.*, 460 Md. 201, 217 (2018)).

Recently, however, "courts across the country have recognized as *de facto* parents a narrow class of third parties who have a special relationship with a child." *Kpetigo v. Kpetigo*, 238 Md. App. 561, 570 (2018). A *de facto* parent is "a party who claims custody or visitation rights based upon the party's relationship, in fact, with a non-biological, non-adopted child." *Conover*, 450 Md. at 62 (quoting *Janice M. v. Margaret K.*, 404 Md. 661,

20

680-81 (2008), *overruled by Conover*, 450 Md. at 66).  Our Court of Appeals enunciated the standard for establishing *de facto* parenthood in *Conover v. Conover.*

### C.    *De Facto* **Parenthood**

In *Conover*, the Court of Appeals recognized *de facto* parenthood and adopted the following four-part test set forth by the Supreme Court of Wisconsin in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wis. 1995), for determining when a person is a *de facto* parent:

(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;

(2) that the petitioner and the child lived together in the same household;

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and

(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Conover*, 450 Md. at 74.

The four-part test adopted in *Conover*, although narrowly crafted, *id.* at 73-74 (recognizing that the test "used to determine *de facto* parenthood was narrowly tailored to avoid infringing upon the parental autonomy of a legal parent"), overturned *Janice M.* and significantly reshaped the doctrine of standing in Maryland family law in holding that "*de facto* parents have standing to contest custody or visitation and need not show parental unfitness or exceptional circumstances before a trial court can apply a best interests of the

child analysis," *id.* at 85. Accordingly, given the multiplex of parties and circumstances presented in family law cases, and the overlapping laws that govern them, it is not surprising that issues of first impression would follow the Court's decision in *Conover*— as both the majority and concurring opinions recognized. *Id.* at 75, n.18, (majority opinion), 88 (Watts, J., concurring). Here, the question is whether a third party can obtain *de facto* parent status where both the legal (biological or adoptive) parents do not consent, by demonstrating "exceptional circumstances" or "parental unfitness."

Father avers that *de facto* parenthood can only be established by parental consent and that consent "cannot be swapped" for exceptional circumstances. The Fosters, quoting *E.N.*, 474 Md. at 394-95, maintain that prospective *de facto* parenthood can be achieved when it is demonstrated that both legal parents' consent to such a relationship, "**or that a non-consenting legal parent is unfit or exceptional circumstances exist.**" (Emphasis supplied by the Fosters). To resolve this issue, we must delve deeper into the opinions by the Court of Appeals in *Conover* and *E.N. v. T.R.*

### 1. *Conover v. Conover*

In *Conover*, a same-sex couple, Michelle[6] and Brittany Conover, entered into a relationship in 2002 and decided to have a child together. 450 Md. at 55. Brittany

---

[6] In *Conover*, Michelle noted that "she is now a 'transgender man' and states that the record does not reflect her gender identity because she transitioned to living as a man after the contested divorce hearing occurred. She further explained that she would refer to herself using female pronouns and her former name for consistency with the record and that her gender identity is not material to any legal issue in this appeal." 450 Md. at 55 n.1. Accordingly, consistent with the Court of Appeals, we also refer to Michelle "using female pronouns and her former name." *Id.*

conceived a child through artificial insemination and gave birth to a son in April 2010. *Id.* Although the son's birth certificate listed Brittany as his mother, no one was identified as the father. *Id.* Michelle and Brittany married when the child was approximately six months old but separated a year later. *Id.* Initially, Michelle had overnight and weekend access to the child, but eventually, Brittany prevented Michelle from visiting him. *Id.*

In February 2013, Brittany filed a complaint for absolute divorce and alleged that "there were no children shared by the couple from the marriage." *Id.* Michelle subsequently filed an answer and counter-complaint and requested visitation rights but not custody. *Id.* Following an evidentiary hearing, the circuit court concluded that Michelle did not have standing to seek custody or visitation. *Id.* at 57. While the court found that Michelle was a *de facto* parent to the child, relying on *Janice M.*, 404 Md. 661, the court concluded that Michelle did not have third-party standing absent a showing "that Brittany was unfit or that exceptional circumstances existed to overcome the biological mother's constitutionally protected interest in the care and control of her child." *Id.* at 58. Michelle appealed the trial court's order on visitation, and this Court affirmed in a reported decision. *Id.* at 59.

On *certiorari*, the Court of Appeals made "explicit that *de facto* parents are distinct from other third parties" and held that a *de facto* parent has "standing to contest custody or visitation and need not show parental unfitness or exceptional circumstances before a trial court can apply a best interest of the child analysis." *Id.* at 85. In so doing, the Court overturned *Janice M.* as "clearly wrong and contrary to established principles" and as "undermined by subsequent events." *Id.* at 77.

23

The Court adopted the Supreme Court of Wisconsin's *H.S.H.-K.* test, observing that it was consistent with Maryland law because it was "narrowly tailored to avoid infringing upon the parental autonomy of a legal parent." *Id.* at 74. The Court explained that the doctrine "does not contravene the principle that legal parents have a fundamental right to direct and govern the care, custody, and control of their children because a legal parent does not have a right to voluntarily cultivate their child's parental-type relationship with a third party and then seek to extinguish it." *Id.* at 75. Rather, relying on the Supreme Court of South Carolina's reasoning in *Marquez v. Caudill*, 656 S.E.2d 737, 744 (S.C. 2008), the Court instructed:

> The first factor in the *H.S.H.-K.* test is **critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child.** This factor recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced.

*Id.* (quoting *Marquez*, 656 S.E.2d at 744) (emphasis added) (cleaned up). The Court concluded that its holding "fortif[ied] the best interests standard by allowing judicial consideration of the benefits a child gains when there is consistency in the child's close, nurturing relationships." The Court explained that it was "carefully[] adopting the multi-part test first articulated by the Wisconsin Supreme Court in *H.S.H.-K.*," because that test "accommodates . . . the dissonance between what is in the best interest of a child and a parent's right to direct and govern the care, custody, and control of their children." *Id.* at 85. Accordingly, the Court reversed the judgment of this Court and directed us to remand

24

the case to the circuit court "for determination of whether, applying the *H.S.H.-K.* standards, Michelle should be considered a *de facto* parent." *Id.*

Judge Greene and Judge Watts wrote concurring opinions. In Judge Greene's concurring opinion, he explained that, while he agreed that "*de facto* parent status should be recognized in Maryland," he did not agree "that a person who qualifies as a *de facto* parent is not required, *per se*, to establish exceptional circumstances." *Id.* at 86 (Greene, J., concurring). Judge Greene would consider, alongside other "probative factors," whether a "psychological bond with the child . . . would warrant a finding of an exceptional circumstance, and could overcome the presumption in favor of the legal or adoptive parent to control access to the child." *Id.*

Judge Watts, joined by Judge Battaglia, agreed with "the recognition of *de facto* parenthood in Maryland" as espoused by the Majority, but explained that, in their view, the *H.S.H.-K.* test is "too broad" and "could have a negative impact on children in Maryland." *Id.* at 87 (Watts, J., concurring). Specifically, Judge Watts expressed concern that "the Majority holds that only one parent is needed to consent to and foster a parent-like relationship with the would-be *de facto* parent." *Id.* at 87-88. While the *H.S.H.-K.* test works when there is only one existing parent, it did not account for problems when there are two existing parents. *Id.* at 88. Judge Watts explained:

> Where there are two existing parents, however, permitting a single parent to consent to and foster a *de facto* parent relationship could result in a second existing parent having no knowledge that a *de facto* parent, *i.e.*, a third parent, is created. Such situations may result in a child having three parents vying for custody and visitation, and being overburdened by the demands of multiple parents. Today, many children are not living in a classic nuclear family. Families include not only same-sex married parents—in which one

25

parent had a child before marriage—but also separated or divorced parents who conceived children during a marriage, as well as two parents who have never married. The Majority has written broadly a solution for *de facto* parents that will serve couples well under circumstances similar to the parties in this case, where there is only one biological or adoptive parent. The majority opinion, however, will have greater consequences in cases for children with two existing parents because a *de facto* parent request may occur without the knowledge or consent of the second existing parent. Children who already have difficulty with visitation schedules, or experience custody issues pertaining to two parents, will not be served well by the creation of a test that does not account for the second existing parent's knowledge and consent.

*Id.*

The *H.S.H.-K.* test, Judge Watts wrote, "creates the irreconcilable result . . . that one parent may consent to and foster a *de facto* (third) parent for a child without any sort of notice to, or consent from, a second existing parent." *Id.* Judge Watts concluded with the following guidance:

To fill the obvious void left by the majority opinion, I would offer the following guidance. In every instance in which a trial court is confronted with a request for *de facto* parentship, the trial court should ascertain whether there are one or two existing biological or adoptive parents. In the case of two existing parents, the trial court should require that the second parent have notice of the *de facto* parent request and ascertain whether the second parent consents to the *de facto* parent relationship. In satisfaction of the first prong of the H.S.H.-K. test, an action for *de facto* parenthood may be initiated only by an existing parent or a would-be *de facto* parent by the filing of a verified complaint attesting to the consent of the establishment of *de facto* parent status. The trial court should find by clear and convincing evidence that the parent has established:

> **that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child, and in the event of two existing biological or adoptive parents, that both parents consented to the establishment of a *de facto* parentship[.]**

26

*Id.* at 93 (cleaned up) (bold emphasis added).

Although the Majority urged trial courts to exercise caution in recognizing *de facto* parenthood and "avoid having a child or family to be overburdened or fractured by multiple persons seeking access," it did not specifically address the concern raised in Judge Watts's concurrence. *Id.* at 75 n.18 (majority opinion).

## 2. *E.N. v. T.R.*

Five years later, in *E.N. v. T.R.*, the Court of Appeals—Judge Watts now writing for the Majority—returned to the issue of *de facto* parenthood and examined "the requirements necessary for establishment of *de facto* parenthood in Maryland where a child has two legal parents, specifically, whether both parents must consent to, and foster, a prospective *de facto* parent's formation and establishment of a parent-like relationship with the child." 474 Md. at 351.

In *E.N. v. T.R.*, the biological mother of two minor children and the father's fiancée sought sole legal and physical custody of the children. *Id.* at 354. Following a five-day trial, the circuit court granted the fiancée's complaint for custody. *Id.* The court determined that the biological mother "did not consent to or foster the children's relationship" or "even know" the fiancée. *Id.* at 354-55. It was "clear" to the court that the fiancée "did not establish that [the biological mother] was unfit or that exceptional circumstances existed such that [the fiancée] could be declared a *de facto* parent." *Id.* at 355. Nevertheless, the circuit court found that the "four factors of the H.S.H.-K. test were satisfied and that [the fiancée] was a *de facto* parent of the children." *Id.* The court reached

this finding largely because the biological father consented to the establishment of a *de facto* relationship between his fiancée and his children. *Id.* 354-55.

The mother appealed, and this Court affirmed the judgment of the circuit court in a reported opinion. *E.N. v. T.R.*, 247 Md. App. 234, 252 (2020), *rev'd*, 474 Md. 346 (2021). Specifically, we held that a "*de facto* parent relationship can be created by only one legal parent consenting to and fostering a parent-like relationship with a putative *de facto* parent." *Id.* at 247. While recognizing that "*Conover* did not expressly address" this issue, we found "no constitutional infringement on Mother's due process rights because, once [the fiancée] achieved *de facto* parenthood status, [the fiancée] qualified as a 'legal parent' entitled to co-equal fundamental constitutional protections." *Id.* at 249. We surmised that "such a rule strikes the proper balance between parents' fundamental rights to care for their children and the children's fundamental rights to be placed with caregivers who will promote their best interests." *Id.*

The Court of Appeals reversed, holding that "under the first factor of the H.S.H.-K. test adopted by this Court in Conover for establishment of *de facto* parenthood, where there are two legal (biological or adoptive) parents, a prospective *de facto* parent must demonstrate that **both legal parents consented to and fostered such a relationship or** *that a non-consenting legal parent is unfit or exceptional circumstances exist*." 474 Md. at 394-95 (emphasis added). Central to the Court's analysis was a parent's "fundamental right, protected by the Fourteenth Amendment of the United States Constitution, to direct and govern the care, custody, and control of the parent's children." *Id.* at 395. "[C]ompletely disregarding whether both legal parents have consented to and fostered a

28

prospective *de facto* parent's parent-like relationship with a child, or that a parent is otherwise unfit or exceptional circumstances exist, not only runs afoul of a parent's constitutional rights, but also basic family law principles." *Id.* at 396-97. The Court expounded further upon restating its holding:

> In light of the fundamental rights at stake and important principles expressed in our case law, we are compelled to hold that, for the well-being of children and family relationships in Maryland, before establishing *de facto* parenthood where there are two existing legal parents, both parents must be shown to have consented to a third party's formation of a parent-like relationship with a child or, in the alternative, that one or both parents are unfit or exceptional circumstances exist. A parent has a fundamental constitutional right to raise and care for the parent's child and where there are two legal parents, one parent's knowing participation in the formation of a third party's *de facto* parent relationship with a child cannot suffice to serve as the consent of the second parent. Endorsing a holding that would permit *de facto* parenthood to be established with the consent of only one parent where there are two legal parents would intrude upon the second parent's constitutional rights, be inconsistent with our case law concerning parental custody (case law holding that third party intervention for custody requires a showing of unfitness or exceptional circumstances), and would potentially create circumstances that are untenable for all involved.

*Id.* at 398.

The Court noted that the biological mother did not "expressly or impliedly consent[]" to the relationship between her children and the fiancée. *Id.* at 395. "In addition, [the fiancée] did not establish that [mother] was an unfit parent or that exceptional circumstances existed such that [the fiancée] would have standing to seek custody of the children." *Id.* Consequently, the fiancée could not meet the first factor of the *H.S.H.-K.* test, and the court erred in granting her *de facto* parent status. *Id.*

Rather than conclude its analysis there, the Court further explored application of the first factor of the *H.S.H.-K.* test in *Conover*. *Id.* at 401-02. Among other things, the Court

29

"recognized that *de facto* parenthood 'cannot be achieved without knowing participation by the biological parent.'" *Id.* at 401 (quoting *Conover*, 450 Md. at 74). The Court reiterated:

> . . . . [T]he first factor is not only critical because it makes a legal parent a participant in the creation of the *de facto* parent's relationship with the child, but also because it "recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced."
>
> Read to its logical conclusion, to satisfy the first factor, where there are two legal parents, both parents must knowingly participate in consenting to and fostering the third party's formation of a parent-like relationship with a child. Otherwise, we create the incomprehensible situation in which a *de facto* parentship may be created by the knowing participation of only one legal parent while an equally fit legal parent is denied the same knowing participation in the process and denied the meaningful input that we deemed so critical for a parent to have in creating *de facto* parent status for a third party.

*Id.* at 401 (quoting *Conover*, 450 Md. at 75). The Court emphasized that the "first factor requires that the legal parent consented to and fostered, the prospective *de facto* parent's formation and establishment of a parent-like relationship with the child." *Id.* at 404-05.

Judge Biran dissented, joined by Chief Judge Barbera. *Id.* at 414 (Biran, J., dissenting). According to Judge Biran, "[t]here is no sound basis in law or policy to require that both legal parents must consent to and foster a third party's parental-type relationship" but rather "[i]t should suffice that one of the legal parents has consented to the relationship." *Id.* Judge Biran observed that in *Conover*, the *H.S.H.-K.* factors "set forth a high bar for establishing *de facto* parent status, which cannot be achieved without knowing participation by the biological parent." *Id.* at 415. Rather than view a "nonconsenting parent's right to parent their child" as a "zero-sum situation," the "nonconsenting legal

30

parent remains a parent to the child." *Id.* at 418. Yet, this right is not absolute. According to Judge Biran,

> [T]he Majority's position ignores a reality that all parents understand when they have a child: the union that produced the child may not last forever. Thus, it is reasonably foreseeable to any legal parent at the time a child is born that there may come a day when the other legal parent will "invite[ ] a third party into a child's life," and thereby "alter a child's life by essentially providing him with another parent." *Marquez v. Caudill*, 376 S.C. 229, 656 S.E.2d 737, 744 (2008). When they have the child, the two legal parents typically do not know whether the union will end and, if so, which one of them may consent to and foster a parental-type relationship between the child and a new partner.

*Id.* at 421. Judge Biran concluded that he "cannot join an opinion that will lead to the severing of parental-type relationships without first giving a family court the opportunity to consider whether it is in the best interests of a child to allow a psychological parent to have some measure of access to the child and, thereby, keep intact the bond that has formed. Instead, I would hold that the consent of one legal parent is sufficient to establish the necessary 'consent' under the first part of the *H.S.H.-K.* test." *Id.* at 438.

### 3.    *Analysis*

*E.N. v. T.R.* presented "the first occasion" for the Court of Appeals to "address [the] application of the first factor of the four-factor test adopted in <u>Conover</u> to circumstances where a child has two existing legal parents." *E.N.*, 474 Md. at 395. Here, we are presented with the first occasion to address the application of the four-factor test to circumstances that involve two existing parents, but neither consent to the formation of a parent-like relationship between their child and the would-be *de facto* parents. Applying the principles and teachings imparted in *Conover* and *E.N.*, we hold that where a child's existing legal

31

parents both do not consent to the formation of a parent-like relationship between the child and a third party, the third party has failed, under the first factor of the *H.S.H.-K.* test, to establish a *de facto* parent relationship. The first factor requires that "the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child." *Conover*, 450 Md. at 74 (citation omitted). The third party, however, may obtain custody of the child after establishing that the parents are either unfit or that exceptional circumstances exist such that continued custody with the parents would be detrimental to the child's best interest. *E.N.*, 474 Md. at 372 (describing requirement for third-party standing in a custody case); *Ross v. Hoffman*, 280 Md. 172, 178-79 (1977) (holding that the presumption of custody with a parent may be overcome if "(a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child"). Once a party has demonstrated unfitness or exceptional circumstances, the court can proceed to the best interests of the child analysis, and there is no need to show *de facto* parentage in order for the third party to have standing.[7]

Here, the circuit court found "that [*de facto*] parenthood of [C.] was established by the Fosters through exceptional circumstances, therefore they were able to meet the first prong." Father rightly claims that the circuit court conflated the third-party "exceptional circumstances" analysis with the first prong of the *de facto* parentage test, when they are,

---

[7] Our holding and the circumstances in this case do not require that we decide whether a party can obtain *de facto* parenthood status after a separate showing of exceptional circumstances.

in fact, separate constructs. There are at least two reasons why one cannot be substituted for the other.

First, the requirements for obtaining status as a *de facto parent*, focus on the *relationship* between a *third party* "with a non-biological, non-adopted child" which the parent consents to and nurtures. *Conover*, 450 Md. at 62, 85. By contrast, the unfitness or exceptional circumstances analysis focuses on the *parents'* inability to continue to have custody of their child because the continuation of custody is against the child's best interests. *McDermott*, 385 Md. at 325. A third-party can obtain standing to pursue custody of a child through either path, but they are not the same, and the distinction matters. As previously noted, a *de facto* parent is accorded the same constitutional rights as a biological or adoptive parent, and with that, the presumption that the child's best interests are to be with that parent. In third-party custody cases, the third party does not have equal standing with a fit parent; that party must rebut the presumption and the court must undertake the delicate constitutional balancing that is avoided when "each fit parent's constitutional right neutralizes the other parent's constitutional right," rendering the parents as "presumptive equals." *McDermott*, 385 Md. at 353; *see E.N.*, 474 Md. at 371 (quoting *McDermott*, 385 Md. at 353).

Second, the term "exceptional circumstances" has different connotations and carries different meanings and requirements among the various types of third-party custody

proceedings.[8] *See In re Adoption/Guardianship of Rashawn H.,* 402 Md. 477, 498 (2007) (explaining that "[t]he notions of 'unfitness' and 'exceptional circumstances' have a different connotation in TPR cases than they do in custody and visitation disputes, however. In a custody case, unfitness means an unfitness to have *custody* of the child, not an unfitness to remain the child's parent; exceptional circumstances are those that would make parental *custody* detrimental to the best interest of the child.").

As previously stated, the first factor requires "that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child." *Conover*, 450 Md. at 74 (quoting *H.S.H.-K.*, 533 N.W.2d at 435-36). Long held precedent recognizes the fundamental rights of parents, inherent in the Due Process Clause of the Fourteenth Amendment, to direct the care, custody, and control

---

[8] For example, in light of the "important rights at stake" in a Termination of Parental Rights ("TPR") proceeding, the Court of Appeals has "described three elements of heightened protection provided to parents in a TPR proceeding":

> First, we have recognized that there is the "presumption that the interest of the child is best served by maintaining the parental relationship, a presumption that may be rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." Second, this presumption can only be overcome if the State establishes by clear and convincing evidence of unfitness or exceptional circumstances to justify a TPR. This is a heavier burden than the preponderance of evidence standard utilized in a standard child custody case. Third, the General Assembly provided factors that the juvenile court must expressly consider in determining whether termination is in the child's best interest. While a juvenile court is permitted to consider additional factors, the statutory factors are intended to provide the basis for any termination of parental rights.

*In re Adoption/Guardianship of C.E.*, 464 Md. 26, 49-50 (2019) (cleaned up).

of their children. The Court of Appeals adopted the *H.S.H.-K.* test, in part, because it is "narrowly tailored to avoid infringing upon" these constitutional rights. *Id.* at 74. Accordingly, the Court highlighted that the first factor in the *H.S.H.-K.* test—the consent prong—is "***critical* because it makes the *biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child*.**" *Id.* at 75 (quoting *Marquez*, 656 S.E.2d at 744) (emphasis added). Both the *Conover* and *E.N.* Courts "recognized that *de facto* parenthood 'cannot be achieved without knowing participation by the biological parent.'" *E.N.*, 474 Md. at 401 (quoting *Conover*, 450 Md. at 74). Judge Biran's dissent in *E.N.* equally recognized that the *H.S.H.-K.* factors "set forth a high bar for establishing *de facto* parent status, which cannot be achieved without knowing participation by the biological parent." *Id.* at 415 (Biran, J., dissenting).

As Judge Watts's concurring opinion in *Conover* and her majority opinion in *E.N.* reveal, the concern of the Court of Appeals was not that the first factor necessary to establish *de facto* parenthood should be broadened, but rather, that this factor should be constrained to protect a parent's constitutional rights. *Id.* at 93 (Watts, J., concurring); *E.N.*, 474 Md. at 398. To substitute the requirement that the existing legal parents consent to the formation of a parent-like relationship between the child and a third party, with a finding of "exceptional circumstances," would confer constitutional parental standing rights on potentially countless parties. Consider, for example, as this case demonstrates,[9]

---

[9] Days after the July 2020 overdose incident, the Fosters filed a complaint for custody and moved for emergency relief. At the hearing on the same day, a magistrate found that extraordinary circumstances existed and recommended granting temporary

(Continued)

35

the fact that our trial courts often find exceptional circumstances necessary to grant custody to a third party on a temporary basis.

For the foregoing reasons, we do not read the holding in *E.N.* to mean that "exceptional circumstances" can substitute for consent under the first prong of the *H.S.H.- K.* test.

Returning to Father and the Fosters, we conclude that *de facto* parenthood status was not properly conferred on the Fosters because neither Father nor Mother consented to the development of a parent-like relationship. Moreover, we are unpersuaded by the Fosters' alternative argument that Father provided implied consent to the Fosters while he was recovering from heroin addiction. The Fosters do not direct us where the circuit court concluded that Father impliedly consented to the formation of a *de facto* parental relationship, and we have not found any such consent in our review of the record. An appellate court is ill-equipped to and, indeed, cannot "substitute our judgment for that of the fact finder." *Gordon v. Gordon*, 174 Md. App. 583, 626 (2007).

We turn now to examine whether the circuit court appropriately determined that exceptional circumstances permitted the court, after examining C.'s best interests, to confer third-party custody of C. with the maternal grandparents.

---

custody of C. to the Fosters. Also that same day, the circuit court ratified the magistrate's findings and recommendations. Our Courts often interchange "extraordinary" and "exceptional" circumstances in considering third-party custody cases. *See*, *e.g.*, *Burak v. Burak*, 455 Md. 564, 659 (2017).

## II.

## Exceptional Circumstances

### A.     Parties' Contentions

Father avers that the "trial court additionally was clearly erroneous and/or abused its discretion when it found that 'exceptional circumstances' existed which entitled the Fosters to parental status superior to that of [Father]." Relying on *Ross v. Hoffman*, 280 Md. 172 (1977), and *Burak v. Burak*, 455 Md. 564 (2017), Father argues that "the 10 month interval in the present case [between the July 2020 overdoes incident and entry of the Parenting Plan] . . . fails to qualify as a 'long time' for purposes of 'exceptional circumstances.'" Father urges that this delay is "not sufficient to demonstrate abandonment or transfer of physical custody."

In response, the Fosters maintain that Father was not involved in C.'s care and "relinquished parental duties for a child with special needs to the Fosters." Concerning the length of time, the Fosters aver that it "is one factor for exceptional circumstances, and in this case, Father was absent and was found to have neglected the child during the child's entire life up and until the Fosters were awarded custody."

### B.     Analysis

In the preeminent case on third-party custody, *Ross v. Hoffman*, the Court of Appeals observed that, "Child custody disputes fall into two categories with respect to those seeking custody: disputes between the biological parents and disputes between a biological parent and a third party[.]" 280 Md. 172, 174 (1977). Of course, the overarching and controlling test in both categories of disputes is the best interests of the child standard.

37

*Id.* at 175.  Consequently, the Court observed, "[e]ven when father and mother are living together, a court has the power, if the best interests of the child require it, to take it away from both parents and commit the custody to a third person.  In other words, a court of chancery stands as a guardian of all children[.]"  *Id.* at 176.  Still, the law accords a "prima facie presumption that the child's welfare will be best []served in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary."  *Id.* at 178 (quoting *Ross v. Pick*, 199 Md. 341, 351 (1952)).

In *Hoffman*, the Court of Appeals collected certain factors "which may be of probative value" in determining whether "exceptional circumstances" exist in a dispute between a child's actual or adoptive parent[s] and a third party.  *Id.* at 191.  These factors include:

(1) the length of time the child has been away from the biological parent;
(2) the age of the child when care was assumed by the third-party;
(3) the possible emotional effect on the child of a change of custody;
(4) the period of time which elapsed before the parent sought to reclaim the child;
(5) the nature and strength of the ties between the child and the third-party custodian;
(6) the intensity and genuineness of the parent's desire to have the child; and
(7) the stability and certainty as to the child's future in the custody of the parent.

*Burak v. Burak*, 455 Md. 564, 659 (2017) (citing *Hoffman,* 280 Md. at 191).  While not exclusive or mandatory, these factors have emerged as the "standards and guidelines that generate 'exceptional circumstances.'"  *McDermott v. Dougherty*, 385 Md. 320, 419 (2005).  The Court of Appeals has held that other factors may be relevant to an "exceptional

circumstances" analysis, including "the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs." *Sider v. Sider*, 334 Md. 512, 532 (1994) (quoting *Turner v. Whisted*, 327 Md. 106, 116-17 (1992)); *see also Monroe v. Monroe*, 329 Md. 758, 775-76 (1993) (concluding that the child's relationship with a third-party is a relevant factor in exceptional circumstances inquiry). In custody cases, "exceptional circumstances are those that would make parental *custody* detrimental to the best interests of the child." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 498 (2007) (emphasis in original).

Judge Hotten, writing for the Court of Appeals, explained in *Burak v. Burak*, that the purpose of the first *Hoffman* factor, "is to determine whether the child [ ] has been outside the care and control of the biological parent for a sufficient period of time for a court to conclude that the constructive physical custody of the child has shifted from the biological parent to a third-party." 455 Md. at 663. Alternatively stated, the first factor concerns whether "a biological parent has, in effect, abandoned his or her child." *Id.* While this first factor is "not the exclusive consideration," a "court must first determine that the child at issue has spent a long period of time away from his or her biological parent before considering the other *Hoffman* factors." *Id.* at 662-63.

Returning to our case, Father avers that the length of time here was not sufficient to demonstrate abandonment or transfer of physical custody. In support, Father asserts that prior cases reflect longer periods of separation than the time in this case. *See Hoffman,* 280 Md. at 192 (finding first factor satisfied where there was a "protracted separation of mother from child, beginning at the child's tender age of about four months and lasting for eight

and half years"); *Ross v. Pick*, 199 Md. 341, 351 (1952) (noting an "important feature of this case is that [foster parents] had the care and custody of the child from the time he was less than two years old until he was over eleven"). Although the time period reflected in the cases referenced by Father is longer than the current situation, the length of time is not controlling. Rather, as *Burak* directs, the relevant inquiry is whether the child "has been outside the care and control of the biological parent for a sufficient period of time for a court to conclude that the constructive physical custody of the child has shifted from the biological parent to a third-party." 455 Md. at 663.

In applying the first *Hoffman* factor, the court found that Father "relinquished all parenting responsibility to the Fosters until May of 2021" after his overdosing on heroin while caring for C. During this period, *which consisted of the majority of C.'s life*, the Fosters "bond[ed] with [C.] as parents." Although the judge found that Father had made significant strides in his recovery, for a substantial period of C.'s life, the judge concluded that Father had abandoned C. and "neglected him," requiring intervention by the State and the Fosters to protect C. and care for his needs. We conclude, based on the unique aspects of this case, that C. was away from Father for a sufficient time to shift constructive custody to the Fosters.

Indeed, this shift is evident in the circumstances relevant to the other factors considered by the trial judge in her oral ruling. *See In re Adoption/Guardianship of Darjal C.*, 191 Md. App. 505, 532 (2010) ("A court is 'not required to recite the magic words of a legal test[] . . . as an adherence to form over substance, [which would] not cause the Genie to appear[,]' and particular words are 'neither required nor desired if actual consideration

40

of the necessary legal considerations are apparent in the record.'" (quoting *S. Easton Neighborhood Ass'n, Inc. v. Town of Easton*, 387 Md. 468, 495 (2005)). Specifically, regarding the "possible emotional effect on the child," the court found that the Fosters had "bonded" with C. This conclusion is supported by substantial evidence in the record, including the testimony of the custody evaluator, Anita Tucker. Alternatively, the court recognized that Father was "at the beginning stages" of a parent/child relationship and that visitation with Father had resulted in disruption to C.'s sleep schedule and other manifestations of separation anxiety, including nail biting.

Finally, the court found that C.'s developmental delays required significant care. While the court found that the Fosters were "primarily responsible for all aspects of [C.]'s daily care and long-term care," the court had concerns that Father had "yet to demonstrate an ability to care for [C] without the assistance of his parents" and with Father's "ability to maintain a stable home for [C.], because he is heavily reliant on the family and is at the beginning stages of being self-sufficient." We hold that the circuit court properly considered whether exceptional circumstances were present and that the circuit court did not abuse its discretion.[10]

---

[10] Father does not contest the circuit court's best interests analysis.

## III.

## AWARD OF FUTURE CUSTODY

### A. Parties' Contentions

Father avers that the "trial court abused its discretion when it entered an order under which [Father] cannot increase his time with the child, absent consent or a change in circumstances." According to Father, the court "provided for less visitation than the parties agreed" and "failed to include any provision whereby [Father] could increase his visitation time." Relying on *Boswell v. Boswell*, 118 Md. App. 1, 31 (1987), Father contends that the judge abused her discretion by failing "to articulate why [Father]'s visitation of one week per month is limited, without any provision for an increase in time."

In opposition, after distinguishing *Boswell*, the Fosters aver that the "schedule implemented with phases and conditions . . . was to provide safety and stability in light of [C.] having been neglected and maltreated at 6 months of age as a result of Father's heroin overdose." According to the Fosters, "[i]t does not require further explanation of the [c]ourt that for so long as Father lives in New Jersey, and the child's life is in Maryland, an increase of time is not reasonable or child centered." Further, relying on *Schaefer v. Cusack*, 124 Md. App. 288 (1998), the Fosters contend that "*in futuro* custody determinations are considered an abuse of discretion." Finally, the Fosters argue that there are "proactive steps" that Father may undertake to "better situate himself to be a primary caregiver" for C. but the court "need not outline them."

42

## B.     Analysis

Father's question narrowly asks us to consider whether "the trial court abused its discretion when it entered an order under which [Father] cannot increase his time with the child, absent consent or a change in circumstances." We conclude that the circuit court did not abuse its discretion by entering a custody order that does not provide for an increase in Father's time with C.  Indeed, had the court done what Father proposes, it would have abused its discretion.  We explain.

In making a custody determination, "courts look to the situation as it exists at the time." *Schaefer v. Cusack*, 124 Md. App. 288, 295 (1998).  In *Schaefer*, this Court analyzed a custody order which granted physical custody of a minor child, then five years later, to his mother until completion of the fifth grade and then to his father until his eighteenth birthday.  *Id.* at 291-92.  In determining that the circuit court abused its discretion, we explained:

> We have not the faintest idea of what the situation of the parents may be at the time when this child completes the fifth grade, obviously a number of years hence.  We know not what the living conditions of the parties at that time will be.  We know not where the parties will be living.  We do not know what their incomes will be.  We have no idea of what kind of physical condition the parents or child will be in at that time.  We do not know what the preference of the child at that time may be.  We have no idea whatever as to the condition under which the parents will be living.  Although thus far there has been no hint of immorality, we do not know what the situation will be at the time of the contemplated change in custody.  We do not know what effect a change in custody might have on the child.  All of these are relevant considerations.
> It is hard enough to look into the future and to determine what may be perceived as the best interest of the child on the basis of circumstances as they exist at the time of a custody hearing.  We consider it to be an abuse of discretion to attempt to look ahead and to determine now that it will be in the

43

best interests of a child who has not yet entered kindergarten to have his custody changed upon completion of the fifth grade.

*Id.* at 297-98. We see no reason to diverge from our reasoning in this case.

To the extent Father complains that the court abused its discretion in granting him a week of visitation a month, as opposed to some greater number, we first observe that the trial judge thoroughly reviewed the relevant custody factors and offered the reasons for her decision in great detail. The Court noted that C., who has developmental delays, had been obtaining services from the Anne Arundel County Infant and Toddlers Program, where "caregivers learn daily strategies and tasks to work with [C.]." The court noted that it was in [C.'s] best interests to receive these early intervention services in Anne Arundel County. The court further found that Father has moved back with his parents in New Jersey, has demonstrated a "lack of involvement" in C.'s treatment strategies, and that no similar support services were in place for C. in New Jersey. It is clear to us, from the judge's findings, that she presented a visitation schedule that would allow C. to obtain the treatment he needs in Maryland, and still visit his Father one week out of the month. Moreover, in regard to the holiday schedule, the court specifically found: "Given my concerns regarding the importance of maintaining stability for [C.] and to ensure that it does not negatively impact his ability to receive services, I believe that the holiday schedule is an opportunity to increase [Father]'s access with [C.] in a way that minimizes a negative impact[.]" We discern no abuse of discretion in the court's custody determination and visitation schedule.

**CONCLUSION**

We hold that because neither Father nor Mother consented to the development of a parent-like relationship, *de facto* parenthood was not properly conferred on the Fosters under the first factor of the *H.S.H.-K.* test adopted in *Conover.* However, based on the circumstances of this case, we hold that the circuit court did not abuse its discretion in finding exceptional circumstances sufficient to award the Fosters third-party custody of C. Accordingly, we remand the case to the circuit court with instruction to vacate the portion of its custody order granting the Fosters *de facto* parenthood status of C. The remaining provisions of the court's order remain in full force and effect.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED WITH INSTRUCTION TO THE CIRCUIT COURT TO VACATE PORTION OF ORDER GRANTING *DE FACTO* PARENTHOOD STATUS TO APPELLEES; COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEES.**